473 So.2d 1188 (1985)
Alfred Thomas GAMBLE
v.
STATE.
3 Div. 856.
Court of Criminal Appeals of Alabama.
May 14, 1985.
Rehearing Denied July 2, 1985.
Certiorari Denied August 23, 1985.
*1189 Oakley Melton, Jr. and Joseph C. Espy, III, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Phillip Luke Hughes, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 84-1074.
BOWEN, Presiding Judge.
Alfred Thomas Gamble was indicted for trafficking in cocaine, in violation of § 20-2-80, Code of Alabama 1975. At trial, after the State had established a prima facie case, Gamble pled guilty to an amended indictment charging felony possession of cocaine, in violation of § 20-2-70. The record satisfies the waiver requirements of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and the voluntariness of the guilty plea is not contested on appeal. Sentence was ten years' imprisonment and a fine of $8,500. After sentencing, Gamble was allowed to withdraw his guilty plea, and the case was submitted to the trial court, without a jury, on the testimony previously presented. The court found him guilty and imposed the same sentence and fine. The purpose of this procedure, as stated by the trial court, was "to insure that the Defendant have a full appellate review of this Court's ruling on the motion to suppress."

I.A.
Gamble argues that there was no probable cause for his arrest and the search of his automobile. At a pretrial suppression hearing, Montgomery Police Investigator C.H. Mims testified that in the early morning hours of January 5, 1983, he appeared before Montgomery District Judge Mark Kennedy, was placed under oath, and signed the following affidavit pursuant to a request for a nighttime search warrant:
"AFFIDAVIT FOR NIGHTTIME SEARCH WARRANT
"Before me, Honorable H. Mark Kennedy, Judge of the Fifteenth Judicial Circuit of Alabama, personally appeared C.H. Mims, who is known to me and being first duly sworn, deposes and says as follows:
"That he has reason to believe and does believe that controlled substances are being kept, stored, concealed, or held in a standard courier box, Federal Express Air Bill No. XXXXXXXXX. Said package is being kept stored or held in a 1981 Datsun 280ZX, VIN JN1CZ04SXBX601766, which vehicle is in the possession of Alfred T. Gamble.

*1190 "The facts tending to establish the grounds for issuance of a nighttime search warrant are as follows:
"That affiant has received information that Alfred T. Gamble has been using and selling cocaine, a controlled substance. That based upon this information, affiant began an investigation and determined that within the past six (6) months, Alfred T. Gamble had been receiving packages addressed to `A & T Brokers' and `A-G Associates,' by Delta Airlines, said packages containing return addresses which were fictitious. Further, that Alfred T. Gamble was sending cash money through Delta Airlines addressed to individuals who did not reside at said addresses. Further, that there is no record of any existence of the individuals to whom the money was sent.
"That within the past three (3) months, packages were being shipped from Fort Lauderdale, Florida by Federal Express addressed to `A & T Brokers' and `A-G Associates,' and that Alfred T. Gamble received said packages.
"That on January 4, 1983, affiant was notified by an employee of Federal Express that Alfred T. Gamble had called Federal Express concerning a package which he was expecting. That employees of Federal Express determined that said package had been inadvertently shipped to Dothan and would be returned to Montgomery on the afternoon of January 4, 1983. That affiant met with Lynn Butler, the Branch Manager of Federal Express and that Lynn Butler gave affiant and other law enforcement officers permission to enter the Federal Express truck which had left Dothan and arrived in Montgomery. That Staff Sergeant James Hale and his dog, Wolf, were also given permission to enter said truck. That Wolf indicated to Sergeant Hale that a package, Air Bill No. XXXXXXXXX, addressed to A-G Associates, contained a controlled substance. Further, that the return address on said package is 1325 No. East 46th Court, Ft. Lauderdale, Florida, and that such address is fictitious.
"Further, that on January 4, 1983, Alfred T. Gamble signed for and received from Federal Express the above-described property and placed said package in the above described vehicle. That Alfred T. Gamble was stopped by members of the Montgomery Police Department, and that said vehicle was seized and is under surveillance by members of the Montgomery Police Department.
"Further, probable cause exists in that said dog is a graduate of the Drug Narcotic Detection School in San Antonio, Texas, which school is run by the United States Air Force and the United States Department of Defense. Further, that said dog is certified by said Drug Narcotic Detection School and by the Base Commanders at Maxwell Air Force Base and Gunter Air Force Base.
"Further, that Staff Sergeant James Hale attended Patrol Dog Class and participates in an On-Job-Training Program for drug detection.
"Further, that Staff Sergeant Hale has been working with Wolf since June of 1982 and that Wolf has proven reliable on more than five (5) occasions.
"That, based upon this information, affiant believes and does have reasonable cause to believe that said package being kept, stored, or concealed in said vehicle, contains a controlled substance.
 /s/
 C.H. Mims
 AFFIANT
 1/5/83
/s/
 H. Mark Kennedy
 JUDGE
 1/5/83"
Judge Kennedy thereupon issued the following search warrant:
 "STATE OF ALABAMA
 COUNTY OF MONTGOMERY
 "TO ANY SHERIFF OR DEPUTY OF
 MONTGOMERY COUNTY,
 ALABAMA:
"Proof by affidavit having been made this day before me, by C.H. Mims, Montgomery *1191 Police Department, you are hereby commanded to make immediate search upon a 1981 Datsun 280ZX VIN JN1CZ04SXBX601766, and any part of said vehicle and any packages contained therein, including, but not limited to, a standard courier box, Federal Express, Air Bill No. XXXXXXXXX, the property of Alfred T. Gamble, located at 238 Adams Avenue, Montgomery, Alabama, for the following property: controlled substances."
Relying on Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), Gamble argues that Mims' affidavit did not provide probable cause for a search because it was based, in part, upon hearsay information from an unnamed informant of unproven reliability and credibility. Based on the failure of Mims' evidence to meet the Aguilar-Spinelli test, Gamble claims that the dog-sniff search was unauthorized because it was not supported by a reasonable belief that Gamble's property contained contraband. In sum, Gamble maintains that both the initial warrantless dog-sniff intrusion and the ultimate search of his automobile by warrant were unconstitutional.
In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a seizure of property from the individual for the purpose of subjecting it to a dog-sniff test is justified on less than probable cause.
"A `canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminative and more intrusive investigative methods.
"In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue hereexposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a `search' within the meaning of the Fourth Amendment."
462 U.S. at 707, 103 S.Ct. at 2644-45.
The court concluded that the standard applicable to the seizure of property from the person for a canine sniff test is the same as that for a "Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]-type investigative stop." 103 S.Ct. at 2645. In the case before us, we can assume that the standard is even less stringent since the Federal Express package was not seized from Mr. Gamble's person for the sniff-test, but was intercepted in transit before it reached him. Unlike the "seizure of personal luggage from the immediate possession of the suspect" in United States v. Place, the seizure here caused no restraint of the person or disruption of travel plans. 103 S.Ct. at 2645.
Nevertheless, applying Terry standards to the dog-sniff test conducted here, it is our judgment that in light of the particular circumstances known to Investigator Mims there were "specific and articulable facts" which "`warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate." Terry v. Ohio, 392 U.S. at 21, 22, 88 S.Ct. at 1880. Mims testified that a six-month investigation revealed that Gamble had sent cash to *1192 fictitious individuals at non-existent Florida addresses and had received more than ten packages with false Florida return addresses. As the United States Supreme Court has observed, "Florida is well-known as a source of narcotics and other illegal drugs. United States v. Mendenhall, 446 U.S. 544, 562, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J., concurring in part and concurring in judgment); DEA, Narcotics Intelligence Estimate, The Supply of Drugs to the U.S. Illicit Market From Foreign and Domestic Sources in 1980, pp. 8-9." Illinois v. Gates, 462 U.S. 213, 243, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983). The Court has also taken note of the drug trafficker's pattern of dealing in cash and using assumed names. Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). In our judgment, Gamble's sending cash to fictitious addresses and receiving packages from nonexistent persons, all located in Florida, provided the Montgomery Police investigators with "adequate grounds for suspecting" Gamble of dealing in drugs "and for temporarily detaining [his Federal Express package] while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." Florida v. Royer, 460 U.S. at 502, 103 S.Ct. at 1326.
The fact that Investigator Mims' initial tip concerning Gamble's drug dealing came from an unnamed informant of undemonstrated reliability and credibility does not affect our conclusion that the dog-sniff test was based on reasonable suspicion. The other information uncovered by Mims, i.e., the suspicious cash outlay and package travel, was sufficient to satisfy the Terry-type requirement for a dog sniff as outlined by the Court in United States v. Place.
Having determined that the warrantless dog sniff test was authorized under the "reasonable suspicion" rationale of Terry v. Ohio, we must now decide whether the later search of Gamble's automobile, specifically the Federal Express package located therein, was based on probable cause. There is some authority in Florida v. Royer, supra, for the proposition that the outcome of the dog sniff alone could have provided probable cause. In that case, the Court noted that, had narcotics detection dogs been used, Royer's detention could have been much less intrusive:
"A negative result [to a dog sniff test] would have freed Royer in short order; a positive result would have resulted in his justifiable arrest on probable cause."

460 U.S. 506, 103 S.Ct. at 1329. We do not base our holding, however, strictly on the dicta in Royer. Instead, we find that, based on the totality of the circumstances, Judge Kennedy had a substantial basis for concluding, when he issued the warrant in the instant case, that there was a fair probability that contraband would be found in Gamble's automobile. In other words, we adopt the test set out by the United States Supreme Court in Illinois v. Gates. In Gates, the Court abandoned the rigid Aguilar-Spinelli "two-pronged test" for determining whether hearsay in a search warrant affidavit should be credited, and substituted a more flexible "totality of the circumstances" approach.
Under prior law, Investigator Mims' affidavit would have failed the Aguilar-Spinelli test since it did not set out any reasons why Mims' informant should be believed; it did not document the tipster's "veracity," "reliability" or "basis of knowledge." Under Gates, however, an issuing magistrate, as well as a reviewing court, may look to other circumstances indicating the probability of criminal activity and need not hinge his entire decision whether to issue a warrant on the proven credibility of an anonymous informant.
In the case before us, the "other circumstances" pointing to the probability of Gamble's being involved in drug dealing include the results of Mims' own six-month investigation of the defendant and the positive result of the dog sniff test. Thus, although Mims' affidavit contained no information showing his informer's believability, that "deficiency ... may be compensated *1193 for ... by some other indicia of reliability." Illinois v. Gates, 462 U.S. at 233, 103 S.Ct. at 2329. Here the strong indicia of reliability were Gamble's patterns of cash sending and package receiving, coupled with the positive result of the dog sniff test. These facts more than compensated for the unproven credibility of Mims' initial informer. Thus, in our judgment, there was probable cause to believe that contraband existed in Gamble's automobile.

I.B.
Gamble insists that our review of the search warrant affidavit should be governed by Aguilar-Spinelli, the law in effect at the time the warrant was issued on January 5, 1983, rather than by Illinois v. Gates, which was decided on June 8, 1983, after his conviction. He claims that to apply Gates retroactively is to deny him due process of law.
The weight of unanimous authority, however, is contrary to Gamble's position here. As the Maryland Court of Appeals recently observed, "The courts of other jurisdictions have held uniformly that the rule of Gates applies to all cases pending on direct review when Gates was decided." Potts v. State, 300 Md. 567, 479 A.2d 1335, 1341 (1984). See, e.g., United States v. Mendoza, 727 F.2d 448 (5th Cir.1984); United States v. Little, 735 F.2d 1049 (8th Cir.), on rehearing sub nom. United States v. Sager, 743 F.2d 1261 (1984), cert. denied, ___ U.S. ___, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); United States v. Estrada, 733 F.2d 683 (9th Cir.), cert. denied, ___ U.S. ___, 105 S.Ct. 168, 83 L.Ed.2d 103 (1984); State v. Espinosa-Gamez, 139 Ariz. 415, 678 P.2d 1379 (1984); People v. Tisler, 103 Ill.2d 226, 82 Ill.Dec. 613, 469 N.E.2d 147 (1984); State v. Horsey, 676 S.W.2d 847 (Mo.App.1984). See generally W. LaFave, 3 Search and Seizure § 11.5 (1978). Furthermore, the United States Supreme Court, although not discussing retroactivity, has applied Gates to a case that was on direct appeal at the time Gates was decided. See Massachusetts v. Upton, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).
In United States v. Johnson, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Supreme Court established guidelines for determining whether a Fourth Amendment case is to be given retroactive application. After stating the general rule that a new Fourth Amendment decision is to be applied retroactively to all cases still pending on direct review at the time the decision was rendered, 457 U.S. at 562, the Court outlined several exceptions to the norm of retroactivity, notably that if the new decision was a "clear break with the past" it would be applied only prospectively. Id. (quoting Desist v. United States, 394 U.S. 244, 248, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969)). The Court then observed that a "clear break with the past" occurred if:
"a decision explicitly overrules a past precedent of this Court, or disapproves a practice this Court arguably has sanctioned in prior cases, or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved."
United States v. Johnson, 457 U.S. at 551, 102 S.Ct. at 2588 (citations omitted).
Of the courts holding Gates to be retroactive, some have found under the foregoing Johnson test, that Gates was not a "clear break with the past," see, e.g., United States v. Mendoza, supra; Potts v. State, supra. Some, like the Maryland Court of Appeals, have reasoned that "Illinois v. Gates does not involve a clear break with the past.... Gates did not create an entirely new legal standard; instead it `reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations.'" Potts v. State, 479 A.2d at 1343 (quoting Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. at 2332).
Other courts have reasoned that the retroactivity guidelines set out in Johnson simply do not apply to Gates because Johnson determined the retroactivity of a decision (Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)), which expanded the reach of the exclusionary *1194 rule, while Gates limited the reach of the exclusionary rule, see, e.g., United States v. Sager, supra; United States v. Estrada, supra; People v. Tisler, supra. As the Court of Appeals for the Eighth Circuit observed:
"In each instance the question of retroactivity related to a new decision expanding the rights of criminal defendants, and a major argument made against retroactivity was that it would disappoint the reasonable reliance of the authorities on what they thought was the law. The extent to which law-enforcement authorities had relied on the old rule was always a major consideration in deciding the question of retroactivity. See, e.g., Solem v. Stumes, 465 U.S. 638, 104 S.Ct. 1338, 1341, 1343-45, 79 L.Ed.2d 579 (1984); Johnson, 457 U.S. at 549, 102 S.Ct. at 2586."
United States v. Sager, 743 F.2d 1261, 1264, cert. denied, ___ U.S. ___, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). The holding of Illinois v. Gates, however, was less favorable to criminal defendants and more supportive of police conduct. Its retroactive application, therefore, would disturb neither the reliance interest of the police nor the criminal defendant. As the Illinois Supreme Court pointed out in People v. Tisler, supra, a criminal defendant cannot be said to have relied, prior to undertaking his illegal activity, on the prevaling construction of search warrant affidavits.
Thus, regardless of the rationale employed, we hold, like every other court which has considered the question, that the decision of Illinois v. Gates should be applied to all cases pending on direct review at the time Gates was handed down. Accordingly, we find that the affidavit for the search warrant in the case before us met the requirements of probable cause.

II
Gamble next claims that the fruits of the search should have been suppressed because the search warrant, which did not expressly authorize a nighttime search, was executed at night. Section 15-5-8, Code of Alabama 1975, provides the following:
"A search warrant must be executed in the daytime unless the affidavits state positively that the property is on the person or in the place to be searched, in which case it may be executed at any time of the day or night. The issuing judge or magistrate must state in the warrant, according to the character of the affidavits, whether it is to be executed by day or at any time of the day or night." (Emphasis added.)
Gamble does not question the sufficiency of the affidavit for a nighttime search, and we are convinced that it meets the requirement of "stat[ing] positively that the property is on the person or in the place to be searched...." Ala.Code § 15-5-8 (1975); Collins v. State, 410 So.2d 463 (Ala.Cr.App.1982). The question, as the trial court framed it in its order denying the motion to suppress, is "whether or not, under the circumstances of this case, the failure of the issuing judge to use the words `at anytime of day or night' or words of similar import in the warrant invalidates the warrant and renders inadmissible the evidence discovered during the search." We answer that question in the negative.
In Dean v. State, 54 Ala.App. 270, 307 So.2d 77 (Ala.Cr.App.1975), this court upheld a nighttime search for which the warrant lacked a directive that it be served "at any time of the day or night." We found that because the warrant was in fact issued at night under authorization for an "immediate" search, the statutory requirement of § 15-5-8 was satisfied. See also United States v. Sturgeon, 501 F.2d 1270 (8th Cir.), cert. denied, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). The same situation is present here. As the trial judge found, "The issuing judge was requested and did issue the warrant in the middle of the night knowing that it would be immediately executed."
Gamble insists that the trial court's finding regarding the issuing judge's knowledge of when the warrant was to be executed is a fact outside the record of which *1195 there is no proof. We do not believe, however, that the finding is one which requires proof of the district judge's state of mind. Because the record clearly shows that Judge Kennedy issued the warrant in the nighttime hours and the warrant form directed an "immediate" search, the actual state of the judge's mind is immaterial; the record speaks for itself. In a similar case, the Court of Appeals for the Sixth Circuit agreed, reasoning that, "[T]he Kentucky judge here undoubtedly knew such a search would occur, since he was requested to and did issue the warrant [authorizing an `immediate' search] in the middle of the night." United States v. Searp, 586 F.2d 1117, 1122 (6th Cir.1978), cert. denied, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979). See also State v. Dudgeon, 13 Ariz.App. 464, 477 P.2d 750 (1970) (judge who issued warrant but failed to strike out words "in the daytime" from the form phrase "in the daytime (or at any time of the day or night)" knew that the warrant would be executed at night because it was issued after dark).
Although there is a split of authority on the admissibility of evidence obtained in a nighttime search when the warrant does not contain language authorizing nighttime execution, see generally Annot. 58 A.L.R. Fed. 757 (1982); compare State v. Dudgeon, supra (allowing evidence), with State v. Dalrymple, 80 N.M. 492, 458 P.2d 96 (1969) (disallowing evidence on the ground that a warrant must conform to statutory requirements in every material detail), of those courts finding the warrant technically invalid many have, nevertheless, refused to order suppression of the evidence on one or more of the following grounds, namely: (1) a statutoryas opposed to a constitutional violation does not automatically warrant exclusion, see, e.g., United States v. Searp, supra; State v. Lien, 265 N.W.2d 833 (Minn.1978); (2) the statutory violation was not a result of bad faith conduct on the part of law enforcement authorities, see e.g., United States v. Searp, supra; and (3) the violation did not affect the defendant's substantial rights, see e.g., United States v. Ravich, 421 F.2d 1196 (2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).
In the case before us, the good faith of the Montgomery police officer who requested the search warrant is evident. Officer Mims' affidavit requested a nighttime search warrant and contained facts adequate for the issuance of a nighttime warrant. Gamble was not subjected to an abusive, arbitrary intrusion into his home in the middle of the night, but was already in custody and his vehicle under surveillance. As the Supreme Court has recognized, a night search of a residence is particularly offensive. "[I]t is difficult to imagine a more severe invasion of privacy than [a] nighttime intrusion into a private home." Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).
Although the form of the search warrant here was not in absolute compliance with statutory mandates, the defendant's substantial rights were not infringed and the search met the requirements of the Fourth Amendment. In this regard, we agree with the following observation of the Court of Appeals for the Sixth Circuit:
"[W]e think it important to differentiate between the right to be free from unnecessary and frightening intrusions by the State into our homes in the middle of the night and the procedures which have been established to protect that right. In this case the defendant's interests have not been violated, though the procedures were not observed.
"This does not mean, of course, that violation of the required procedures is unimportant; indeed the procedures are the only way to prevent infringements of individual rights. Rather, we hold that requiring suppression in all cases would be a remedy out of all proportion to the benefits gained to the end of obtaining justice while preserving individual liberties unimpaired."
United States v. Searp, 586 F.2d at 1122-1123 (emphasis in original).
Under the circumstances of this case, we believe the warrant was sufficient *1196 to authorize a nighttime search and the evidence was not due to be suppressed on this ground. "An error ... may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. `[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges,'" Massachusetts v. Sheppard, ___ U.S. ___, 104 S.Ct. 3424, 3429, 82 L.Ed.2d 737 (1984) (quoting Illinois v. Gates, 462 U.S. at 263, 103 S.Ct. at 2344 (White, J., concurring)).

III
Finally, Gamble contests the validity of the search on the ground that it was executed by Investigator Mims, a municipal police officer, rather than by a sheriff or his deputy, as directed by the warrant and as mandated by §§ 15-5-1, -5, and-7, Code of Alabama 1975. Those sections, in pertinent part, provide that a search warrant shall be:
"directed to the sheriff or to any constable of the county ...," §§ 15-5-1 and 15-5-5, and
"executed by any one of the officers to whom it is directed, but by no other person except in aid of such officer at his request, he being present and acting in its execution." § 15-5-7.
At the hearing on the motion to suppress, Mims testified that those present at the execution of the warrant were "two Montgomery County Sheriff's Deputies, Sergeant Ken Hallford from ABI Intelligence and Dennis Bodine from the Montgomery Police Department Intelligence." (R. 45). "We were operating under this planthis program under Operation Unity, which is a combination of City, County and State agencies." (R. 74). When asked where the sheriff's deputies were during the search, Mims replied, "There at the vehicle with us.... One was at the rear of the vehicle when the trunk was opened, which comes all the way through to the front of the car. And I do not know where the other one was. He was standing outside the vehicle." (R. 90). Mims also testified that the deputies made the return on the warrant. (R. 72).
In our judgment, the facts of this search fall within the holding of United States v. Martin, 600 F.2d 1175 (5th Cir. 1979), wherein the Fifth Circuit Court of Appeals determined that a search pursuant to an Alabama warrant executed by a municipal officer in cooperation with county sheriff's deputies was valid even if the deputies were present merely to legitimate the search. The court observed the following:
"We are simply not prepared to suppress the fruits of this search on the basis of such artificial technicalities as who called whom, who asked whom to go along, who rode in the first car and who was driving, who read the warrant to the Appellees, who searched where, who found what, et cetera. This search was a cooperative venture by municipal, county, and federal law enforcement officers.... [The municipal police officer's] participation being authorized, we cannot suppress merely because he assumed the initiative in the execution of this search warrant."
600 F.2d at 1183. See also United States v. McCrary, 643 F.2d 323 (5th Cir.1981).
The judgment of the circuit court is affirmed.
AFFIRMED.
TYSON, PATTERSON and McMILLAN, JJ., concur;
TAYLOR, J., dissents with opinion.
TAYLOR, Judge (dissenting).
I respectfully dissent. The majority concede that the search warrant issued for the search of Gamble's car was a bad warrant when it was issued. It is undisputed that under the law as it was at that time, the affidavit was insufficient to support issuance of the warrant. Thereafter, the Supreme Court changed the rules; that fact should not affect this decision.