[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 171 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 172 
Walter Tyrone Ware was indicted on August 20, 2004, by a Mobile County Grand Jury on six counts of owning, possessing, keeping, and/or training a dog for fighting purposes in violation of § 3-1-29, Ala. Code 1975, and one count of possessing a controlled substance in violation of § 13A-12-212, Ala. Code 1975. A suppression hearing was held on January 13, 2005, at which time the trial court denied the defendant's motion to suppress the evidence relating to both the dog-fighting charge and the possession-of-a-controlled-substance charge. On March 18, 2005, a jury found Ware guilty as charged in the indictment.[1] The trial court sentenced *Page 173 
Ware to serve 20 years' imprisonment on each of the convictions of the dog-fighting charges, all six sentences to be served concurrently, and a 20 years' imprisonment for the conviction of the possession-of-a-controlled-substance charge. Ware was sentenced in accordance with the Habitual Felony Offender Act, § 13A-5-9, Ala. Code 1975. Ware was also ordered to pay restitution to the City of Mobile Animal Shelter in the amount of $7,808.71, $100 in each case to the victims compensation fund in accordance with § 15-23-17(b), Ala. Code 1975, $100 to the Forensic Trust Fund pursuant to § 36-18-7, Ala. Code 1975, and $1000 pursuant to the Demand Reduction Assessment Act, §13A-12-281, Ala. Code 1975.
On December 30, 2003, the Mobile Police Department received an anonymous complaint regarding alleged dog fighting at the Ware residence. Officers James White and Steve Chandler of the Mobile Police Department responded to the Ware residence. Upon arriving at the residence, the officers observed several men standing in the yard near two sport-utility vehicles ("SUVs".) The officers saw a bleeding dog lying on the ground next to one of the SUVs as well as a puppy in a carrier in one of the SUVs. A privacy fence surrounded the rear part of property, but the gate to the privacy fence was open. The officers were able to observe through the open gate that other dogs were in the backyard both in cages and on chains. The officers then called the animal-control unit to the scene. David Shaeffer with Mobile Animal Control arrived at Ware's residence and inspected the dogs in the backyard.[2] Shaeffer found 22 pit-bull dogs in the backyard either in cages or tied with heavy chains[3]. Most of the dogs were very thin or emaciated, and at least two dogs had fresh cuts or puncture wounds. After observing the condition of the dogs, Shaeffer cited Mrs. Ware for cruelty to animals, failure to have rabies tags, and lack of a city license.[4]
Later that afternoon, Elizabeth Flott, a humane officer with the Mobile County Society for the Prevention of Cruelty to Animals ("the SPCA"), received a telephone call from the Mobile County District Attorney's office requesting that she contact the police regarding an incident at the Ware residence.[5]
Flott and Mobile Animal Control Officer Robert Sims, along with Officers White and Chandler, returned to the Ware residence at approximately 4:30 p.m. Flott knocked on the door of the Ware residence and informed Mrs. Ware that she had been asked to inspect the dogs. According to Flott, Mrs. Ware directed her to Mr. Ware, who was standing in the yard with four other men.[6]
Mr. *Page 174 
Ware granted Flott permission to inspect the animals. Flott found approximately 20 dogs, some were chained in the backyard; others were in elevated cages. She observed that all of the dogs were underweight and that they all showed signs of scars or scabs. Each dog was chained, and Flott observed no broken chains.
Flott, Sims, and the police officers inspected a shed in the Wares' yard. The shed was a three-sided wood structure with a tarpaulin at the open end. An exercise wheel[7] and a treadmill[8] were found in the shed. A bottle containing .69 grams of Stanozolol, an anabolic steroid and controlled substance, and a syringe were also found on a hay bale next to the treadmill. A rope was also tied to a limb on a tree in the Wares' yard, which is indicative of a "flirt pole."[9]
Likewise a golf club with duct tape around the head of the iron, which had been chewed, was found on the premises. A pair of scales was hanging in the open carport.[10]
After observing the condition of the dogs as well as what appeared to be dog-fighting paraphernalia, Flott determined that sufficient grounds existed to arrest Ware. The dogs were seized and transported to the animal control shelter. After they were relocated to the shelter, the dogs continually tried to bite through the chain-link fence to fight one another.
The next day John Symes, D.V.M., systematically examined each dog, checking it for wounds and injuries, and evaluating the dog's physical condition. Dr. Symes developed a scale between one and five — one being severely underweight and five being normal. No dog received a rating of five. At least 13 of the dogs received a "one" or "two" rating. The dogs also showed signs of serious injuries. Only 5 of the 23 dogs showed no sign of scarring. One dog was missing at least three inches of its tongue and one of its canine teeth. Because it was missing so much of its tongue, this dog was unable to eat or drink and thus had to be euthanized. Another dog had puncture wounds to the side of its mouth and other wounds that had been sustained within the previous 30 days. One dog had puncture wounds on the face near the eye, on top of the head, tears in the ear, and bite wounds on the extremities. Yet another dog had broken canine teeth and its muzzle was swollen to twice its normal size because of multiple punctures. Most of the other dogs had wounds and scars indicative of similar injuries. Dr. Symes, a veterinarian with 26 years' experience, stated the following regarding the treatment of these dogs:
 "Q. [Prosecutor]: Okay. And do you clearly remember what took place and what you did on December 31st?
 "A. [Dr. Symes]: Very much so.
 "Q. How do you remember that so clearly, Doctor? *Page 175 
 "A. It was one of the most dramatic [sic] things I have ever seen in my career.
 "Q. And what was so traumatic?
 "A. I've never examined 23 dogs in that kind of condition before all at one time. And the degrees of the injuries, the bite wounds and the poor condition of the pets, and topped off by the one with the tongue missing and the dogs standing there with one — you know, one leg or even two legs trying to be held up at one time. The dogs were severely injured. It's something that leaves an indelible mark on your head."
(R. 492.)
Because of the dogs were so animal-aggressive and posed a danger to the community, the court ordered that they be euthanized.
 I.
Ware first argues that insufficient evidence existed to substantiate the convictions regarding dog fighting and possession of a controlled substance.[11] "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034
(Ala.Crim.App. 1998) (quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd,471 So.2d 493 (Ala. 1985)). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State,697 So.2d 497, 498 (Ala.Crim.App. 1997) (quoting O'Neal v. State,602 So.2d 462, 464 (Ala.Crim.App. 1992)). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State,728 So.2d 691, 696 (Ala.Crim.App. 1998) (quoting Ward v. State,557 So.2d 848, 850 (Ala.Crim.App. 1990)). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for *Page 176 
decision [by] the jury." Ex parte Bankston,358 So.2d 1040, 1042 (Ala. 1978).
"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v.State, 368 So.2d 871, 874 (Ala.Crim.App. 1978).
 A.
Ware argues that insufficient evidence existed to convict him of dog fighting under § 3-1-29, Ala. Code 1975, because, he says, there was no evidence indicating that Mr. Ware had attended a dog fight or that he had hosted dog fights nor could the State point to when and where the dogs fought. Such evidence, however, is not required, as evidenced by the plain language of the statute:
 "(a) It shall be a Class C felony for any person:
 "(1) To own, possess, keep or train any dog with the intent that such dog shall be engaged in an exhibition of fighting with another dog;
 "(2) For amusement or gain, to cause any dog to fight with another dog, or cause any dogs to injure each other;
 "(3) To permit any act in violation of subdivisions (1) and (2) of this subsection."
§ 3-1-29(a), Ala. Code 1975.
The evidence presented clearly permitted the jury to reasonably exclude every reasonable hypothesis except that of guilt.Cumbo v. State, supra. Twenty-three pit bullswere found chained or caged on Ware's property. The vast majority of the dogs had either fresh founds or scars indicative of bites from another dog. One dog had tears in its ears, and another had to be euthanized because its tongue had been torn or bitten off. The animal shelter had to put plywood over the chain-link fence between the dog pens in the shelter because the pit bulls were trying to bite through the chain-link fence to fight with the dog in the other pen. A treadmill and exercise wheel were found on the property, and two witnesses testified they had only seen such equipment in the possession of others engaged in dog fighting. A pair of scales, similar to the ones found in a supermarket, were also located on the premises. Testimony showed that these scales were similar to scales used to weigh dogs that were being trained to fight. Likewise, a rope found tied in a tree suggested that it had been used as a "flirt pole." Flott testified that the rope was located too close to the trunk of the tree to be used as a child's swing. Also, a vial of Stanozolol, an anabolic steroid, was found next to the treadmill. Stanozolol has the effect of making animals more aggressive.
In Jones v. State, 473 So.2d 1197
(Ala.Crim.App. 1985), another case involving allegations of dog fighting, this Court held that evidence showing that the dogs were dehydrated and undernourished, that the dogs had scars primarily on their face, that the dogs escaped from their pens at the animal shelter to fight each other, and that the dogs tore up their pens requiring the pens to be reinforced was relevant to the issue of the defendant's intent to engage the dogs in fights. 473 So.2d at 1201. Given the evidence in this matter, the jury-here similarly could have reasonably excluded every reasonably hypothesis except that Ware was engaged in dog fighting. Therefore, Ware is not entitled to any relief. *Page 177 
Ware also asserts that the evidence presented at trial did not support multiple convictions based upon § 3-1-29, Ala. Code 1975. He argues that the convictions were based on speculation that there had been more than one dog fight. Ware's assertion and reasoning is incorrect. Section 3-1-29(a)(1) states: "It shall be a Class C felony for any person . . . [t]o own, possess, keep or train any dog with the intent that such dog shall be engaged in an exhibition of fighting with another dog." Each count enumerated in the indictment described a specific pit-bull dog. The evidence substantiated that Ware owned multiple pit bulls for the purpose of fighting; therefore, he is not entitled to any relief.
 B.
Likewise, Ware argues that insufficient evidence existed to convict him of possession of a controlled substance pursuant to § 13A-12-212, Ala. Code 1975, based on the anabolic steroid found in the shed because, he says, the conviction relied on constructive possession.
In a prosecution for possession of a controlled substance, the State is not required to prove that the defendant had actual physical control of the controlled substance; possession may be either actual or constructive. McGruder v. State,560 So.2d 1137, 1139 (Ala.Crim.App. 1989). "`An inference of constructive possession arises when the controlled substance is found on premises owned or controlled by the accused.'"McGruder, 560 So.2d at 1139 (quoting Donahoo v.State, 505 So.2d 1067, 1070 (Ala.Crim.App. 1986)).
Constructive possession cannot be the sole basis for a conviction of a controlled substance. Temple v. State,366 So.2d 740, 741 (Ala.Crim.App. 1978). When the State relies on constructive possession, the prosecution must also prove that the defendant had knowledge of the presence of the illegal drugs. McGruder v. State, 560 So.2d at 1139-40. Knowledge, however, may be established by circumstantial evidence. 560 So.2d at 1140 (quoting Temple v. State,366 So.2d at 741). "`[T]he kinds of circumstances which may provide a connection between a defendant and the contraband are unlimited and will naturally depend on the facts of each particular case.'" 560 So.2d at 1140 (quoting Temple v.State, 366 So.2d at 743). "`Where [controlled substances] are found on premises of which the defendant was in nonexclusive possession, the fact that they were found among or near his personal belongings may be a circumstance which is sufficient to link him with the possession of those [controlled substances].'"560 So.2d at 1140 (quoting Gary v. State,473 So.2d 604, 605 (Ala.Crim.App. 1985)).
It is undisputed that Ware owned the equipment associated with dog fighting that was located in the shed on his property. While the premises appear to be owned by Ware and his wife, Ware was the only individual who exercised control over the shed. Mrs. Ware testified that she did not go into the backyard. Flott testified to the following conversation she had with Ware regarding the equipment found in the shed:
 "Q. [Prosecutor]: . . . Okay. And, Ms. Flott, when you were out there in that shed and you saw each and every — or found this equipment
 "A. [Flott]: Correct.
 "Q. — [W]here was Walter Ware?
 "A. Mr. Ware came up while I was out there. And he was beginning to get a little irritated with me photographing the equipment. And he said: You mean nobody can condition their dogs? And I said: `Condition them for what?' *Page 178 
 "Q. Okay. Did you start questioning Mr. Ware —
 "A. No.
 "Q. — at this point in time?
 "A. He asked me if you — couldn't you condition your dogs for that. And I said: `Condition them for?' And he . . .
 "Q. What did Mr. Ware say?
 "A. He couldn't —
 ". . . .
 "A. I said: `Condition them for?' And he could not answer me."
(R. 195-96.) The vial containing the steroid was located on a bale of hay sitting next to the treadmill, property undisputably owned by Ware. Thus, Ware had substantial control over the location where the controlled substance was found, and the controlled substance was in physical proximity to Ware's personal property. Therefore, sufficient evidence existed for this matter to be submitted to the jury for its determination.See, e.g., McGruder v. State, 560 So.2d 1137
(Ala.Crim.App. 1989) (holding that defendant was in constructive possession of crack cocaine found in bus boy's jacket from a country club, which was located in a closet in a bedroom that contained certificates with the defendant's name, mail addressed to the defendant, pictures of the defendant, and a name tag from the same country club bearing the defendant's name). Therefore, Ware is not entitled to any relief on this claim.
Ware also asserts that it was error to charge him with possession of a controlled substance when the usage of the substance was limited to animals. However, Ware raises this issue for the first time on appeal. "`An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.'" Dickeyv. State, 901 So.2d 750, 756 (Ala.Crim.App. 2004), quotingPate v. State, 601 So.2d 210, 213 (Ala.Crim.App. 1992). Because it is raised for the first time on appeal, this issue is not properly before this court.
 II.
Ware also contends that the trial court erred in denying his motion to suppress evidence gathered from his property on the date of the arrest. He alleges that the warrantless search was unreasonable because, he contends, neither he nor his wife consented to the search.
The record contains no motion to suppress. From the record it appears that Mrs. Ware moved the court to suppress evidence regarding the dogs and other evidence found on the Wares' premises; Mr. Ware joined the motion. It appears from the record that the Wares' motion was based on the argument that they did not consent to the search. A hearing on the motion to suppress was held on January 13, 2005. Officer James White, Elizabeth Flott, Robert Sims, and Mrs. Ware testified.
Officer White testified that he and Officer Steve Chandler responded to a call regarding possible injured animals and dog fighting at the Ware residence. Officer White saw one or two animals in the front of the privacy fence in cages and saw through an open gate in the fence other dogs either in cages or on chains in the backyard. Officer White testified that he spoke with Mrs. Ware, who stated that the dogs were her husband's and that she knew nothing about them. White also testified that he and Chandler left the premises and telephoned the animal-control unit. They returned to the premises with Animal Control Officer David Shaeffer. White testified that no one searched the premises at that time, but that the gate was still open and Shaeffer was able to view the dogs in the backyard. White *Page 179 
then called Flott, and he met Flott and Sims at a nearby church. When White, Flott, and Sims returned to the Ware residence, several men were in the yard. White recalled Mrs. Ware's telling Flott that the dogs belonged to Ware and that he was outside with the other men. White, Flott, Sims, and Ware entered the backyard and observed 23 dogs in the backyard, many of the dogs with old and new injuries and blood on their bodies. Although he could not remember the exact conversation, White recalled Flott asking Ware if she could look around, look at the condition of the dogs, and take some pictures of the dogs, to which Ware agreed. White also recalled Ware's giving Flott permission to look anywhere on the premises she desired.
Flott testified that she, Sims, and several police officers went to the Ware residence on December 30, 2003. She knocked on the door, and Mrs. Ware came to the door. Flott identified herself and explained that she had been requested to come to the Ware residence to look at the dogs. Mrs. Ware told Flott that the dogs belonged to Mr. Ware and that Mr. Ware was in the yard. Flott saw Ware leaving the backyard through the gate to the privacy fence, which was open at that time. Flott requested permission from Ware to inspect the dogs, which he granted. Flott found Ware to be "totally cooperative." (Supp. R. 39.[12]) Flott noticed the shed and could see that something was in it. She asked Ware for permission to look inside the shed, which he granted. White and Sims were also present when Ware gave Flott permission to look inside the shed. Flott entered the open shed and found an exercise wheel, a treadmill, and a bottle containing anabolic steroids, all of which she photographed. Flott asked Ware why he had the equipment, and Ware responded, "You mean, a man can't have his equipment?" (Supp. R. 52.) She again asked Ware why he had the equipment, to which he replied that he was conditioning the dogs.
Robert Sims, an animal-control officer for the City of Mobile, testified that he went to the Ware residence with Flott and police officers on December 30, 2003. Sims stated that Flott knocked on the door of the house and Mrs. Ware came to the door, that Flott identified herself and stated she was there to inspect the dogs, and that Mrs. Ware replied that the dogs belonged to her husband and that he was in the backyard where they could speak to him. Ware was standing next to the privacy fence with four other men. Sims recalled Flott asking Ware's permission to look at the dogs, which Ware gave. Sims and Flott "looked at the dogs, one at a time, . . . really checking them out." (Supp. R. 60.) Sims also recalled Ware giving them permission to look inside the shed.
Tanisa Ware testified that she remembered the police officers first arriving at her home around 12:30 or 1:00 p.m. Mrs. Ware recalled the officer's knocking on her door and saying there had a been a complaint about alleged dog fighting. She thought the complaint had been made because the dogs had been barking excessively that morning. Mrs. Ware testified that the officer reappeared with Flott after Mr. Ware came home from work. Mrs. Ware stated that the officers, Sims, and Flott were already in the backyard at that time and that her husband was inside the residence. She testified that they did not ask her permission to go into the yard. Mrs. Ware recalled telling her husband that the officers, Sims, and Flott were in the backyard and he instructed her to tell *Page 180 
them not to go in the yard. However, by that time they were already taking pictures in the backyard. Mrs. Ware testified that the officers, Sims, and Flott were already inside the privacy fence by the time Mr. Ware left the residence.
After hearing the foregoing testimony and oral arguments of counsel, the trial court denied the defendants' motion to suppress.
 "`This court has long held that warrantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement.' Rokitski v. State, 715 So.2d 859, 861 (Ala.Crim.App. 1997). `One of the exceptions to the rule that a warrantless search is per se unreasonable is a search conducted with the consent of the owner.' Foldi v. State, 861 So.2d 414, 422 (Ala.Crim.App. 2002). `Consent to a search must be knowingly, intelligently, and freely given.' Ex parte Wilson, 571 So.2d 1251, 1255
(Ala. 1990). "`[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.'" Miller v. State, 602 So.2d 488, 491 (Ala.Crim.App. 1992), quoting Florida v. Royer, 460 U.S. 491, 497 (1983)."
Washington v. State, 922 So.2d 145, 164
(Ala.Crim.App. 2005).
While the trial court did not state a reason for denying Ware's motion to suppress, we can infer from the record that the Court found that either Ware or his wife consented to the search. Officer James White, Elizabeth Flott, and Robert Sims all testified that the Wares consented to the search. However, Mrs. Ware testified that neither she nor her husband consented to a search.
This Court recently reiterated the standard of review regarding a court's ruling on a motion to suppress:
 "In reviewing a trial court's ruling on a motion to suppress, this Court reviews the trial court's findings of fact under an abuse-of-discretion standard of review. `When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47
(Ala. 1994); `[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772
(Ala. 1986); and we make `"all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App. 1993), quoting Bradley, 494 So.2d at 761. `[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. . . . Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal' Sheely v. State, 629 So.2d 23, 29
(Ala.Crim.App. 1993)."
State v. Hargett, 935 So.2d 1200, 1203
(Ala.Crim.App. 2005). The determination of the credibility and veracity of the witnesses and evidence is the responsibility of the trial court, not the appellate court. We find no abuse of discretion on the part of the trial court in denying Ware's motion to suppress, and Ware is not entitled to any relief.
 III.
Ware next argues that the trial court erroneously refused to permit photographs of the Ware residence and premises to be admitted into evidence. During the presentation *Page 181 
of Mrs. Ware's defense, her attorney attempted to introduce into evidence 20 photographs of the premises of the Ware residence taken on the eve of trial and over 14 months after the arrests. Upon the State's objection to the photographs, the trial court reserved judgment on their admissibility and allowed Mrs. Ware to identify the photographs. The trial court then sustained the State's objection because Mrs. Ware testified that she never entered the backyard. Ware now alleges on appeal that the trial court mischaracterized Mrs. Ware's testimony and should have admitted the photographs into evidence so that Ware could properly rebut the State's case.
The State asserts that Ware did not properly preserve this issue for appeal because Ware did not object to the denial of entry of the photographs into evidence. It is well established that "[r]eview on appeal is limited to review of questions properly and timely raised at trial." Newsome v.State, 570 So.2d 703, 716 (Ala.Crim.App. 1989).
On the first day of trial, the following communications took place between the trial court and the attorneys of record:
 "[MR. WARE'S COUNSEL]: Yes, sir. Talk to the judge. Yes, sir. We'll attempt to do that.
 "The only other housekeeping issue that I think the court ought to be concerned with is objections. I mean, do you want to hear from all of us, or will you say whomever objects goes for everybody else? No use in all five of us popping up one at the time. And we're not trying to sandbag you. It's just — we can do it that way, or we can do it whoever objects it goes for all Defendants.
 "THE COURT: Well, if one of you objects and I can rule without having to hear what — you know, if you haven't stated a ground and it's pretty clear that I can rule, I'll rule. If you object, and I have some question, I may look to you. And if one of you have — if one of you have an additional ground than the one who stated the objection, I will be glad to listen to that too. I mean —
 "[MR. WARE'S COUNSEL]: I don't think that's going to be a problem, Judge. I think the problem is going to come in where if one objects he's objecting for everybody, as opposed to everybody's got to stand up and say I object also.
 "THE COURT: I agree. I think that ought to be stated for the record. When there is an objection for one, there is an objection for all."
(R. 4-6.)
This issue presents a close question, given the foregoing ruling by the court. We find that the issue is preserved for appeal, although the better practice would have been for Mr. Ware to object to the denial of the admission of the photographs in order to ensure that the issue was preserved as to him on appeal.
We next determine whether of the trial court erred when it denied admission of the photographs into evidence. "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093,1103 (Ala. 2000). The trial judge deemed the photographs inadmissible because Mrs. Ware could not authenticate the photographs. Mrs. Ware testified she did not go past the gate into her backyard. This Court thus finds no abuse of discretion in the trial court's ruling. Moreover, "`"[a] trial court will not be placed in error for assigning the wrong reason for a *Page 182 
proper ruling, if that ruling is correct for any reason."'"Irvin v. State, 940 So.2d 331, 345
(Ala.Crim.App. 2005) (quoting Peraita v. State,897 So.2d 1161, 1183 (Ala.Crim.App. 2003), aff'd, 897 So.2d 1227 (Ala. 2004), quoting in turn Nicks v. State, 521 So.2d 1018,1030-31 (Ala.Crim.App. 1987), aff'd, 521 So.2d 1035 (Ala. 1988)). Even had Mrs. Ware been able to authenticate the photographs, photographs of the Ware premises taken over 14 months after the date of arrest would have been irrelevant. Rule 402, Ala.R.Evid. Ware is thus not entitled to any relief on this claim.
 IV.
Ware also argues that the trial court erroneously permitted the expert testimony of Elizabeth Flott and Sandy Christiansen. However, Ware failed to preserve this issue for appeal. As stated previously, "[r]eview on appeal is limited to review of questions properly and timely raised at trial." Newsome v.State, 570 So.2d at 716.
The State offered Sandy Christiansen as an expert in dog fighting and animal cruelty, and Ware failed to object to Christiansen's being deemed an expert, Thus, Ware failed to preserve this issue for appeal.
Even if Ware had preserved this issue for review, we would find no error. Christiansen's testimony was not based on a scientific theory, but instead on 13 years of experience as director of a humane law-enforcement department and the over 100 dog-fighting investigations he had either worked or supervised. Christiansen also has taught 30 to 40 courses to law enforcement officers on dog fighting. His testimony was thus not subject to the requirements of Frye v. United States, 293 F. 1013
(D.C. Cir.1923). See, e.g., Courtaulds Fibers, Inc. v.Long, 779 So.2d 198 (Ala. 2000) (holding that veterinarian's opinion as to cause of death of horses was not scientific evidence subject to the admissibility requirement ofFrye). Instead, the admissibility of Christiansen's testimony was governed by Rule 702, Ala.R.Evid. Christiansen's testimony is admissible under Rule 702 because his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Rule 702, Ala.R.Evid. Thus, Ware is not entitled to any relief.
Ware also argues that Flott should not have been allowed to provide expert testimony. Although the State asserts in its brief that Flott was properly classified and permitted to testify as an expert, the record is devoid of any indication that Flott was ever offered as an expert by the State. The State did question Flott regarding her qualifications, but no formal motion was ever made offering her as an expert. Because Flott was never offered as an expert, we find Ware's argument to be moot.
Ware did object once during Flott's testimony regarding the wounds found on the dogs, and the trial court overruled the objection. "`The determination of whether evidence is relevant and therefore admissible rests within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion.'" Brown v. State,821 So.2d 219, 224 (Ala.Crim.App. 2000) (quoting Jennings v.State, 513 So.2d 91, 95 (Ala.Crim.App. 1987)). We find there was no abuse of discretion in the trial court's ruling regarding this testimony and, therefore, Ware is not entitled to any relief.
 V.
Next, Ware asserts that the sentence imposed upon him by the trial court is excessive and violates his rights under *Page 183 
the Eighth Amendment to the United States Constitution. Ware was to serve 20-year concurrent sentences for the dog-fighting charges and a 20-year sentence for the possession-of-a-controlled-substance charge. The crimes of which Ware was convicted are Class C felonies, which carry a sentence ranging from one year and one day to 10 years. §§3-1-29, 13A-5-6, 13A-12-212, Ala. Code 1975. Since Ware had a prior felony conviction, he was sentenced under the Habitual Felony Offender Act, which required Ware to be sentenced as if he committed a Class B felony. § 13A-5-9(a)(1), Ala. Code 1975. A sentence for a Class B felony is a term of imprisonment between 2 and 20 years. § 13A-5-(a)(2), Ala. Code 1975. Thus, Ware received the maximum sentence allowed by law.
 As this Court has previously held: "It is well settled that `[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion.' Alderman v. State, 615 So.2d 640, 649 (Ala.Crim.App. 1992). `The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."' Brown [v. State, 611 So.2d 1194,] 1197, n. 6 [(Ala.Crim.App. 1992)], quoting Ex parte Maddox, 502 So.2d 786, 789 (Ala. 1986)."
Adams v. State, 815 So.2d 583, 585 (Ala.Crim.App. 2001).
Ware was given a heightened sentence under the Habitual Felony Offender Act, § 13A-5-9, Ala. Code 1975. Legislatively mandated sentences carry a presumption of validity. McLesterv. State, 460 So.2d 870, 874 (Ala.Crim.App. 1984). "`Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes. . . .'" 460 So.2d at 874, quoting Solem v.Helm, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637
(1983). "`"Where the punishment prescribed by the legislature is severe merely by reason of its extent, as distinguished from its nature, there is no collision with the Eighth Amendment."'"Wilson v. State, 427 So.2d 148, 152
(Ala.Crim.App. 1983) (quoting Watson v. State,392 So.2d 1274, 1277 (Ala.Crim.App. 1980), quoting in turn Ex parteMesselt v. State, 351 So.2d 636, 639 (Ala.Crim.App. 1977)). Likewise, this Court has held that the Habitual Felony Offender Act does not violate the Cruel and Unusual Punishment Clause of the Eighth Amendment. See Watson v. State,392 So.2d 1274 (Ala.Crim.App.1980.)
Ware's argument that his sentence is excessive is without merit. Ware's sentence is within the guidelines imposed by statute; therefore, his rights under the Eighth Amendment were not violated. He is thus not entitled to any relief on this claim.
 VI.
Finally, Ware argues that under Apprendi v. NewJersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435
(2000), his conviction cannot stand because his prior felony conviction was not pleaded in the indictment or presented to the jury. In Apprendi, the United States Supreme Court expressly omitted prior convictions from the facts that would increase the penalty for a crime beyond the prescribed statutory maximum that must be submitted to the jury. 530 U.S. at 490,120 S.Ct. 2348. This Court has previously recognized *Page 184 
that the pretrial notice provision set forth in Poole v.State, 846 So.2d 370 (Ala.Crim.App. 2001), does not apply to the Habitual Felony Offender Act. See Harrison v.State, 879 So.2d 594, 597 (Ala.Crim.App.2003.) Therefore, Ware is not entitled to any relief as to this issue.
For all the foregoing reasons, we affirm the judgment of the Mobile Circuit Court.
AFFIRMED.
McMILLAN, P.J., and SHAW and WISE, JJ., concur.
BASCHAB, J., concurs in the result.
[1] Four condefendants, including Ware's wife. Tanisa, were tried during the same trial as Ware. After the State rested, all parties moved for a judgment of acquittal pursuant to Rule 20.2, Ala.R.Crim.P. The trial court granted the motions as to three of the defendants but did not grant the motions of Ware and his wife. The jury returned a not-guilty verdict in Mrs. Ware's case.
[2] Shaeffer testified that he was escorted into the backyard by Officer White and Mr. Ware, although Mr. Ware did not identify himself at that time. However, other witnesses testified that Mr. Ware was not present at his residence at that time.
[3] The testimony presented during the trial provided inconsistent accounts of the number of dogs located at the Ware residence. The number varied from "approximately 20" to 23. The exact number of dogs is irrelevant to that disposition of this matter.
[4] Although not clear in the record, it appears that a city license is required to operate a kennel. This issue is not presented on appeal.
[5] Pursuant to § 13A-11-242, Ala. Code 1975, Flott has been appointed as a trained agent to inspect allegations of cruelty to animals.
[6] However, Mrs. Ware testified that Mr. Ware was not outside but instead was in the residence and unavailable when Flott arrived.
[7] An exercise wheel is a device consisting of a wheel on which a dog is placed as well as a cage in which a "bait animal" (e.g., cat, opossum, squirrel, raccoon, or smaller dog) is placed for the dog to chase. This equipment is used to build a dog's strength and endurance.
[8] A leash is tied above the treadmill, which holds the dog. When the treadmill is turned on, the dog is forced to run. This also increases a dog's strength and endurance.
[9] A "flirt pole" is a rope tied in a tree onto which a chewy object containing blood or grease is tied. The dog bites the "flirt pole" and holds onto it, thus building the dog's jaw and neck muscles.
[10] Testimony indicated that it is common practice in dog fights for the owners to agree that the dogs must be a certain weight at the time of the fight.
[11] In his argument regarding the sufficiency of the evidence, Ware appears to also venture into the realm of the weight of the evidence. However, Ware did not address the weight of the evidence in his motion for a new trial; thus, that issue is not preserved for us to consider on appeal. Moreover, even had the issue been preserved for appeal, we could not consider it. As this Court explained in Johnson v. State:
 "The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, `viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' . . .
 "In contrast, `the "weight of the evidence" refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.' We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. `"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'"
Johnson v. State, 555 So.2d 818, 819-820
(Ala.Crim.App. 1989) (citations omitted). Thus, this Court will not address the issue of the weight of the evidence.
[12] The record from the suppression hearing is denoted as "Supp. R."